IN RE:                                                    CASE NO.
KEITH HUNTER                                              08-35576
            DEBTOR

## OBJECTION TO CONFIRMATION

Comes Citizens Union Bank ("CUB"), by counsel, and for its objection to confirmation

of the Plan of the Debtor, Keith B. Hunter ("Debtor"), states as follows:

## Introduction and Background Facts

The Debtor is a licensed attorney who has practiced law for approximately twenty-three

years, including four to five years as General Counsel for the Kentucky Lottery Corporation.

(2004 Examination conducted January 20, 2010 (the "Exam"), p. 5, l. 25 - p. 6, l. 2).  The Debtor

filed a Chapter 13 bankruptcy petition with this Court on December 15, 2008 (the "Petition

Date").

In his petition, the Debtor falsely represented that he had not filed bankruptcy

proceedings in the prior eight years. [Docket #1]   In fact, the Debtor did file a prior Chapter 13

skeleton petition with this Court on February 5, 2002 (Case #02-30673), in order to stay a

judicial sale of  real property which was scheduled to occur on that same day.  Then, after

receiving the benefit of the automatic stay and after having the sale canceled, the Debtor filed an

emergency motion to dismiss his 2002 petition [Docket #2, Case #02-30673].  According to the

Order of dismissal, Case #02-30673 was dismissed for Debtor's failure to file completed

schedules and the statement of financial affairs[1] [Docket #4, Case #02-30673].

The Debtor's instant petition was also filed on the eve of foreclosure, in order to stay a judicial sale of his real property scheduled to occur the following morning[2].  On December 16, 2008, the day following the Petition Date, this Court entered its Chapter 13 Order to Debtor [Docket #3], which provided, in part:

> **The debtor is restrained and enjoined from selling, transferring, abandoning, releasing to creditors, or in any way disposing of property until further order of the court**.
>
> Failure to timely comply with this order **will** result in the dismissal of this case without further notice.  (*Emphasis added*)

Thereafter, the Debtor having failed to file his Plan by the Court-imposed deadline, the Court dismissed the Debtor's petition on December 31, 2008 [Docket #7].  On January 12, 2009, CUB filed a Motion to Amend Order of Dismissal [Docket #10], seeking amendment of the Order of dismissal in order to prohibit the Debtor from filing another proceeding for a period of 180 days, or  alternatively, to prohibit the Debtor from filing until thirty days after the newly-scheduled judicial sale date.

The following day, the Debtor filed a Motion to Reinstate [Docket #12], as well as his Plan [Docket #13].  On February 4, 2009, the Court reinstated the case, giving the Debtor until February 18, 2009, by which to file a motion to convert to Chapter 7 [Docket #20].  The Debtor

---

[1]In his Exam, the Debtor testified that his 2002 bankruptcy proceeding was filed for "the other property", and testified that the Court dismissed his case "because all those issues had been resolved."  (Exam, p. 135, l. 9-16).

[2]The Debtor identified the foreclosure as the "more important motivating factor" for his current bankruptcy filing, and testified that he filed bankruptcy to stop the sale of his house. (Exam, p. 17, l. 6-12).

thereafter filed an expedited motion to vacate the Court's Order [Docket #22], which motion was denied [Docket #27]. The Court dismissed the Debtor's case for the second time [Docket #28], for his failure to file his motion to convert.

In response to the second dismissal of his case, the Debtor filed an emergency motion to reopen his case, as well as another emergency motion to reconsider the Court's Order denying his motion to vacate [Docket #30 and #31]. On April 4, 2009, the Court again reopened the Debtor's case [Docket #36].

The Court's indulgence in permitting the reopening of the case was for naught, in that just a few weeks later the Debtor's case was dismissed for the third time, based upon his failure to prosecute the case [Docket #42]. The Debtor again sought reinstatement of his case, which the Court again granted [Docket #44 and #45].

Due to his manipulation and abuse of the system, the Debtor was able to delay his 341 meeting for nearly a year. The first 341 meeting was scheduled for January 26, 2009. Due to the dismissal of his case, that meeting was canceled.

When the case was reinstated following two more dismissals, the 341 meeting was finally rescheduled for Monday, June 22, 2009 [Docket #46]. On June 18, 2009, CUB filed an Objection to Confirmation of Plan [Docket #54]. True to form, the following day, on Friday afternoon, June 19, 2009, the Debtor filed another emergency motion, seeking to continue the 341 meeting scheduled for 8:30 a.m. the following Monday, June 22, 2009 [Docket #55] .

Thereafter, the 341 meeting scheduled for June 22, 2009, was adjourned to September 30, 2009. On September 30, 2009, the 341 meeting was adjourned to December 9, 2009. The Debtor finally filed an Amended Plan (the "Plan") on December 8, 2009, almost one year after

the petition date.  The December 9, 2009 meeting of creditors was again adjourned, to a new date of <u>February 10, 2010</u>, almost fourteen months after the Petition Date!  In the meantime, the creditors have not received payment on their claims.

The Debtor's schedules represent that he owes the following tax obligations:

| | |
|---|---|
| <u>Internal Revenue Service </u>("IRS") | **$40,000.00** |
| <u>Department of Revenue </u>("Revenue Cabinet") | **$37,000.00**. |

The proofs of claim filed by the taxing authorities paint a much different picture.  For example, the proof of claim filed by the <u>IRS</u> discloses that the Debtor failed to file his federal tax returns for 2006 and 2007[3], resulting in an **<u>unsecured priority claim</u>** in the amount of **$23,167.54**.  The proof of claim further indicates that the Debtor failed to pay income taxes for the years 1996, 1997, 1998, 1999, 2000, 2001 and 2002, resulting in a general unsecured claim in the amount of **$187,716.70** [Claim #8], or a total claim of **$210,884.24**.

Similarly, the proof of claim filed by the <u>Revenue Cabinet</u> reflects that the Debtor failed to file state tax returns for the years 1996, 2004, 2005, 2006 and 2007, and that the Debtor filed, but failed to pay taxes for years 2000 and 2003.  The amount claimed on the Revenue Cabinet's **<u>secured priority claim</u>** is **$28,380.70**, <u>plus</u> any amounts which are owing for the tax years 2004, 2005, 2006 and 2007, which the Revenue Cabinet listed as "unknown" [Claim #1].

---

[3]The Debtor testified that the reason his accountant, who he identified as his "friend", did not timely prepare the tax returns was because "Maybe he was ill".  He further testified that his accountant has been "pretty bad, and non-communicative" over the last <u>five years</u> (Exam, p. 111, l. 13-25;p. 32, l. 22-25).  It appears that the Debtor continues to rely upon this same accountant for the preparation of his tax returns, since the recently-filed returns were prepared by Edwin P. Osborne.  This is somewhat incredible, in that in October 29, 2009, the Debtor filed a Motion to Compel Turnover [Docket #62], seeking an order compelling Edwin P. Osborne, an individual identified as his "former" accountant, to turnover records which he was withholding.  The non-filing of Debtor's tax returns, allegedly as a result of his "former" accountant's withholding of documents, would prevent confirmation of the Plan under 11 U.S.C. §1325(a)(9) and §1308.

In his petition, the Debtor scheduled only one parcel of real estate, his home located at **1420 S. Fourth Street** in Old Louisville.  However, some or all of the Debtor's federal tax returns (**<u>Exhibit "A"</u>**) reflect ownership of a parcel of real estate located at **116 Smithfield** in Pennsylvania (the "<u>Pennsylvania Property</u>").  The online records in the Property Assessment Office in Pennsylvania also list the Debtor as the current owner of the Pennsylvania Property.  (**<u>Exhibit "B"</u>**).

Nevertheless, when questioned at the Exam regarding whether he owned the Pennsylvania Property, the Debtor testified as follows:

**Q**.  Have you ever owned any real estate in Pennsylvania?

**A.**  I have.

**Q**.  And what was the address of that property?

**A**.  **907 Fulkerson Street**, I think.

**Q.**  In what city?

**A.**  New Castle, Pennsylvania.

**Q**.  When did you own that property?

**A**.  1983, I think.

**Q.**  1983 until when?

**A**.  I had it for about a year.

**Q.**  To approximately 1984?

**A**.  Probably.

**Q**.  And then you sold it in 1984?

**A**.  It burned down...

**Q**. ...Have you ever owned any property at **116 Smithfield**?

**A**. I did.  That was my mother's property?

**Q**. Was that in your name or her name?

**A**. I think it was in both.  I don't recall.  That was—that was probably approximate 20 – I left Pennsylvania 25 years ago.

**Q.** So you owned it about 25 years ago?

**A.** That's – '79?  Is that 25?  That's 30 years ago.  '79 or '80, something like that...

**Q.** Do you still own an interest in it?

**A.** I don't recall.  I think–she owned it, I helped her out, and I think she repurchased it, but I don't–I haven't looked at that in – since I was in graduate school...

**Q.** You don't know if the property rented or–

**A.** She lives there.  (Exam, p. 105, l. 24 - p. 108, l. 11).

Despite the Debtor's amazing testimony that he "doesn't recall" whether or not he owns an interest in the Pennsylvania Property in which his mother lives, it appears that the Debtor has claimed tax deductions on the Pennsylvania Property, scheduling it as "rental property" (Schedule E), at least for the <u>year 2006</u>, and possibly for <u>2005</u>.[4]  Moreover, on Schedule E to the <u>2006</u> tax return, in order to obtain a tax deduction for "rental property", the Debtor represented to the IRS that neither he nor his family used the Pennsylvania Property for personal purposes for more than (a) the greater of 14 days or (b)10% of the total days rented at fair rental value.

---

[4]The Debtor testified that, when he filed several of his past-due federal returns in January 2010, he was advised that he had previously filed his 2005 return (Exam, p. 110, l. 7-16).  Consequently, the Debtor indicated that the 2005 return which was produced to counsel for CUB is an "unfiled" return.  When asked if the 2005 return which <u>was</u> filed and the <u>unfiled</u> 2005 return produced to counsel were identical, he testified that "I have no idea.  I kind of doubt it, but I have no idea." (Exam, p. 104, l. 5 - 21).  Counsel for CUB has not been provided a copy of the filed return for 2005.

Contrary to the information contained in his recently-filed 2006 federal tax return, and inconsistent with the Pennsylvania property records, the Debtor failed to list the Pennsylvania Property as an asset of his bankruptcy estate. Additionally, the Debtor has never amended his petition to include this property after his Exam.

Moreover, the Debtor's 2006, 2007 and 2008[5] federal returns appear to indicate that real property located at **1449 S. Fourth Street**, Louisville, Kentucky (the "<u>Kentucky Property</u>") is owned by the Debtor. Despite the fact that the PVA records reflect that the Kentucky Property has not been in the Debtor's name since **2001 (<u>Exhibit "C"</u>)**, the Debtor's 2006, 2007 and 2008 tax returns (Schedule E) continue to claim depreciation expense for the property:

2006 Federal Return         **$4,129.00 deduction**

2007 Federal Return         **$23,460.00 deduction**
(Form 4797 to the Return indicates that the Kentucky Property was acquired on February 1, 1988 and that **it was sold on June 30, 2007**, resulting in the Debtor claiming a $23,460.00 loss on his 2007 tax return.)[6]

2008 Federal Return         **$12,394.00 deduction**.
(Form 4797 claims a "suspended loss" of $7,826.00 on the Kentucky Property, as well as a loss on something called a "1449 R&R Porch Overhand"[7], which loss was in the amount of $4,568.00. According to the return, the "1449 R&R Porch

---

[5]And possibly the 2005 federal return, the filed copy of which has not been provided to counsel for CUB, for the reasons stated in the immediately preceding footnote.

[6] The property was conveyed to Action Real Estate, LLC ("Action") by a Commissioner's Deed (**<u>Exhibit "D"</u>**). According to PVA records, the Kentucky property was purchased through judicial sale by Action on **September 25, 2001.** It is currently owned by Bradley Boroughs, who acquired it from Action on July 24, 2002. A proof of claim has been filed by Commonwealth Land Title, by and through its insured, Bradley Burroughs, who filed a Rule 11 sanctions motion against the Debtor, the basis for which is detailed in Proof of Claim #9 herein.

[7]The Debtor testified that he did not know what 1449 R and R Porch Overhand was (Exam, p. 123, l. 6-7).

Overhand" was sold on **January 1, 2008**).

Strangely enough, on **October 26. 2001**, several years prior to tax years for which Debtor's returns claim depreciation for the Kentucky Property, the Debtor wrote to the Code Enforcement Officer of the City of Louisville, disavowing any ownership interest in the Kentucky Property:

> "As previously stated **I have not owned this property since August 21, 2001.** It is inconceivable that I have any obligation to do anything to improve or maintain this property pursuant to any ordinance or statute." (**Exhibit "E"**) (*emphasis added*)

In addition to the foregoing inconsistent positions taken by the Debtor, when questioned during his Exam regarding whether he owned the Kentucky Property listed on his federal tax returns, the Debtor responded that he did not know, and that it is an "accounting issue". When asked whether he sold the Kentucky Property in **June 2007**, as represented in his 2007 tax return, the Debtor stated that the question was a "bad question" because he did not prepare the tax return; that it was again another "accounting issue"; and that he didn't know whether or not he sold the Kentucky Property in June 2007 (Exam, p. 113, l. 23 - p. 119, l. 13). When asked why the Kentucky Property was listed in the 2008 tax return, the Debtor's response was that the question was a "misleading question" (Exam, p. 122, l. 3-8).

Despite the Debtor's representations in his tax returns, neither the Pennsylvania Property, the Kentucky Property, nor the 1449 R&R Porch Overhand are mentioned anywhere in his bankruptcy petition, either as assets of the estate or as property sales which occurred within the two-year period preceding the Petition Date. Although the Debtor may contend that he "forgot" to list these properties in his bankruptcy petition, he certainly did not forget to claim the properties as deductions on his recently-filed tax returns. Moreover, the Debtor has not seen fit

to amend his petition to account for these previously-undisclosed properties.

In addition to the real property at 1420 S. Fourth Street, the Debtor's petition listed **household goods and furnishings valued at $35,000**, as well as his **CD collection and artwork valued at $20,000.** In violation of this Court's Order entered December 16, 2008, restraining and enjoining the Debtor from disposing of property, the Debtor testified on January 20, 2010 that he has disposed of "everything, except I have a couch and a bed." (Exam, p. 86, l. 15-18). He further testified that the property was sold "at a fire sale", "as a result of being forced out of his house"[8] (apparently referring to the judicial sale of his home that occurred in April 2009, but did not result in his removal until September 2009). (Exam, p. 86, l. 7-22). According to the Debtor, the proceeds from the sale of this non-exempt personal property were used for: "Food, medical expenses, general." (Exam, p. 87, l. 18-19).

The Debtor's bankruptcy schedules listed the following assets, at the values stated:

| | |
|---|---|
| Real property located at **1420 S. Fourth Street**, Louisville, Kentucky | **$350,000.00**[9] |
| PNC Bank | $ 200.00 |
| Household Furniture: beds, sofa, dressers, stereo | **35,000.00**[10] |

---

[8]In February 2009, this Court entered an Order terminating the automatic stay as to Citizens Union Bank, said termination to become effective thirty days thereafter [Docket #20]. According to the Deed executed by the Commissioner after the judicial sale, the Debtor's home was conveyed to CUB on September 10, 2009 (**Exhibit "F"**).

[9]Less than four months after filing his bankruptcy schedules which valued the property at $350,000, the Debtor filed a Motion in the foreclosure action, contending that the property was worth "**over $500,000**". He also submitted a Comparative Market Analysis of **$551,207.00** for the property (**Exhibit "G"**).

[10]In a 2003 Financial Statement provided to Citizens Union Bank in order to obtain a $300,000.00 loan, the Debtor represented the value of his home as **$440,000.00**, and the value of his Household Items as **$500,000.00** (**Exhibit "H"**). The debtor also <u>falsely represented</u> in the Financial Statement that (a) he had not filed bankruptcy within the prior seven-year period

|                                            |              |
|--------------------------------------------|--------------|
| Cd's, Art                                  | **20,000.00**|
| Clothing                                   | 5,000.00     |
| Firearms; weighlifting equipment           | **2,000.00** |
| Commonwealth of Kentucky Retirement Plan   | **6,000.00** |
| Housing Project (1%)                        | Unknown      |
| Legal fees on appeal                       | 100,000.00   |
| 2000 Chevy Tahoe                           | 7,000.00     |
| Computer, desk, chair                      | 1,000.00.    |

Although the Chapter 13 appraiser was initially unable to gain access to the Debtor's property [Docket #52], when the appraiser finally did inspect the personal property <u>nine months after the Petition Date</u>, the Debtor's property differed significantly from that listed in his petition.  The Appraisal filed with the Court in late September 2009 reflects the following property:

|                                                              |           |
|--------------------------------------------------------------|-----------|
| Sony 20" color T.V.                                          | $ 50.00   |
| Sofa                                                         | 50.00     |
| Bed (king), dresser                                         | 175.00    |
| **Glock, 9mm semi-automatic pistol**                         | 150.00    |
| Retirement plan (insufficient information to appraise)       | 0         |
| 2000 Chevrolet Tahoe (Low mileage. Not on site; value based on vehicle information and description provided by debtor) | 8,000.00 |
| Desk with chair                                              | 75.00     |
| Sony computer with monitor                                   | 200.00    |

[Docket #60 and #61].

The Debtor testified that at the time of the bankruptcy filing, his 5,400 square foot home was furnished with five beds; two dressers; two sofas; a stereo; a couch; a dining room table and

---

(Exam, p. 135, l. 9-19); (b) he had not been a party to any foreclosure action (Exam, p. 135, l. 23 - p. 136, l. 3); (c)there were no outstanding judgments against him (Exam, p. 142, l. 4-13 and **Exhibit I"**); (d) he had not been involved in any lawsuit which resulted in foreclosure (Exam, p. 142, l. 4 - p. 143, l. 17); and that (e) he was not in default on any federal debt.  (According to IRS's Proof of Claim #8 herein, the Debtor has not paid his income taxes for years 1996, 1997, 1998, 1999, 2000, 2001 and 2002.)

chairs; a glass-top table and chairs; two living room chairs; lamps; a wrought iron patio table and chairs; two televisions (the Sony and a 50-inch television); lawn equipment; weightlifting equipment, a bicycle, a stationery bicycle, artwork; vases purchased at St. James Art Fair; prints purchased at St. James Art Fair, at least one of which was worth "hundreds of dollars"; a pool table, a washer and dryer; a refrigerator, a desk, a chair, and a computer (Exam, p. 37, l. 24- p. 43, l. 25;  p. 45, l. 23 - p. 45, l. 5;  p. 52, l. 9-18;  p. 87, l. 20-21;  p. 89, l. 4-25).

Moreover, the Debtor testified that he owns a **.380 firearm** (Exam, p. 45, l. 23 - p. 46, l. 5).  When later directly questioned whether he owned a **9 mm Glock**, he admitted that he did own such a weapon, which he had purchased  in 1992 or 1993 (Exam, p. 103, l. 9-20).  Despite his testimony that he owned two guns, the only gun  listed in the Court appraisal was a Glock, 9mm semi-automatic pistol (Exam, p. 103, l. 24-25).  The Debtor's explanation for the omission of the .380 from the appraisal was that it was "Probably oversight" (Exam, p. 151, l. 9-24).

The Debtor's petition also reflects a $6,000.00 balance in a Commonwealth of Kentucky Retirement Plan through his employer, Jefferson County Attorney's Office (the "Office").  The Debtor testified that he has been a prosecutor with the Office since April of 2003 (Exam, p. 7, l. 7-9;   p. 37, l. 6-10; p. 46, l. 16-20).  He further stated that he began contributing to his retirement account "As soon as [he] started working there" in April 2003 (Exam, p. 61, l. 1-3).  Since the bankruptcy filing, the Debtor has filed an Amended Schedule I [Docket #64], listing a deduction of $543.83 per month for retirement account contributions.   However, at the current monthly contribution rate of $543.83, the Debtor, who has been employed with the Office for almost seven years, would have accumulated much more than the $6,000.00 balance reflected in his petition. (He would have accumulated at least $45,000.00 by now.)

In addition, the Debtor's schedules list as an asset "Legal fees on appeal", in the amount of **$100,000.00**. However, shortly after the Petition Date, when seeking to convince the Court <u>not</u> to require him to convert his case to Chapter 7, the Debtor's Expedited Motion to Alter, Amend or Vacate Order (the "Expedited Motion") represented the value of these legal fees as "**no less than $150,000.00**". Rather than use these fees to fund his Plan, the Debtor testified at his Exam that he may buy his house back with these legal fees (Exam, p. 75, l. 11 - 16; p. 76, l. 7-10).

When questioned at the Exam regarding any other legal fees which were owing to him, the Debtor finally admitted that he was involved in representing parties in litigation and/or had outstanding legal fees owing to him:

*Elmer B. Downs v. Kentucky Lottery Corp.*, Jefferson Circuit Court, Case #03-CI-009867 (Class action against the Debtor's former employer, based upon violations of the Consumer Protection Act. The Debtor represents the plaintiff, and would not disclose the fee arrangement for this proceeding.) (Exam, p. 94, l. 4-21) (**Exhibit "J"**)

*Gregory J. Meredith v. MSD*, Jefferson Circuit Court, Case #05-CI-006148 (Case in which the Debtor testified that he "did some work", for which he has been paid.) (Exam, p. 94, l. 22 - p. 95, l. 5) (**Exhibit "K"**)

*Regina A. Collins v. Kentucky Lottery Corporation*, Jefferson Circuit Court, Case #05-CI-007701 (Class action against the Debtor's former employer, based upon claims of breach of fiduciary duty, violation of the Consumer Protection Act, and several state claims, in which the debtor represents the plaintiff) (Exam, p. 95, l. 10 - p. 96, l. 12) (**Exhibit "L"**)

*Auto Owners Insurance Company v, Cherish Brown*, Jefferson Circuit Court, Case #07CI-4703 (Case which the Debtor testified he is handling on a pro bono basis, at the request of an individual who the Debtor refused to identify.) (Exam, p. 97, l. 3-4) (**Exhibit "M"**)

*Tina Burriell v. Glennon N. Zelch, Trustee of the Z.G. Land Trust #1093*, Jefferson Circuit Court, Case #09-CI-007473 (Personal injury claim case in which the Debtor represents the defendant.) (Exam, p. 97, l. 4-14) (**Exhibit "N"**)

*Welsh v. Phoenix Transportation*, Scott Circuit Court, Case #2007-CA-001231 (Exam, p. 68, l. 24 - p. 69, l. 6)  (Case filed by the Debtor and members of the Zielke Firm (the "Firm"), alleging wrongful discharge of plaintiff, due to plaintiff's belief that her employer was attempting to have her engage in tax evasion, tax fraud and fraud of the company's books. The case is ongoing, and a motion for discretionary review was filed September 21, 2009.) (**Exhibit "O"**)

*Burgess, et al v. Paducah Area Transit Authority, et al*, Sixth Circuit Court of Appeals, Case #08-5626  (Civil rights case which is ongoing, the Debtor having filed a reply brief on November 16, 2009.) (This may be the Sixth Circuit Court of Appeals case in which the Debtor testified he "probably ha[s}...3 to $400,000 billable time in.") (Exam, p. 70, l. 1 - 6;  p. 83, l. 23 - p. 84, l. 8) (**Exhibit "P"**)

*Barry Snadon and Maury Gantt v. JP Fourth St. Live, LLC d/b/a Red Cheetah and Parrot Beach*, Jefferson Circuit Court, Case #06CI6760 (Debtor "filed a claim against two of the restaurants at Fourth Street Live for racial discrimination",   (Exam, p. 70, l. 16 - 25) (**Exhibit "Q"**)

The Debtor further testified that he had "no idea" of how much money the Firm owed him on the

Petition Date for cases on which he had worked prior to the bankruptcy filing (Exam, p. 71, l. 4-

5) p. 72, l. 1-4).

In addition, it appears that the following cases were pending, in which the Debtor

represents a party litigant:

*St. James Court Association, et al v. Stanley Bush, et al*, Jefferson Circuit Court, Case #06-CI-0458 (**Exhibit "R"**)

*Keith B. Hunter, et al v. Kentucky Lottery Corporation*, Jefferson Circuit Court, Case #03-CI-08783 (Class action in which the Debtor was originally a plaintiff. Debtor subsequently withdrew as plaintiff, and is now counsel for class action plaintiffs in litigation against his former employer.)  (**Exhibit "S"**)

*Christy Williams, et al v. Louisville & Jefferson County Metropolitan Sewer District, et al*, Jefferson Circuit Court, Case #06-CI-02352 (**Exhibit "T"**)

*Henry Bacon v. Building Champions, LLC*, Jefferson Circuit Court, Case #04-CI-10573 (Debtor represents the Defendant.)  (**Exhibit "U"**)

The Debtor's petition failed to schedule <u>any</u> of these fees/receivables as assets or income

with which to fund his Plan, although the Debtor admitted in his Exam that he had receivables on the Petition Date (Exam, p. 63, l. 24 - p. 64, l. 1).  When asked which of the cases in his caseload had been concluded in 2009, the Debtor testified that the fees in the two or three matters which went from one court to the next on appeal "could be anywhere from 400 to 700,000" dollars (Exam, p. 82, l. 2-17) .

In addition to the aforesaid  legal fees/receivables, the Debtor failed to disclose the fact that he had any claims against anyone.  However, in reviewing the state court files for pending litigation, it was discovered that the <u>Debtor himself is a party</u> to a lawsuit styled <u>*Keith B. Hunter v. The Field Generals: Operation Level Playing Field, LLC*</u>, Jefferson Circuit Court, Case #09-CI-009261 (the "Debtor Litigation").  (**<u>Exhibit "V"</u>**)   According to the Debtor's testimony, the basis for the Debtor Litigation is a "fee dispute and defamation claim" for fees that he thought he was going to be paid in 2008.  The amount of the fees was $60,000 or $70,000.  (Exam, p. 93, l. 10 - 25).

Although it is clear that the Debtor Litigation claim existed when the Debtor filed his petition on December 15, 2008, this claim was never scheduled as an asset of the Debtor's estate.  In fact, earlier in his Exam, and <u>prior to being specifically asked whether he was involved in a lawsuit</u> by that particular name, the Debtor testified that he was <u>not</u> a party to any lawsuit, either personally or as an officer or director, shareholder or member of a business, other than the two lawsuits which were listed in his bankruptcy petition (Exam, p. 24, l. 7-11).

When questioned regarding his income, the Debtor's testimony was that the income of $4,020.25 listed in Schedule I of his petition represented income from the Office.  The Debtor also testified that he is "Of Counsel" to the Firm, and that he is "paid by what he earn[s]"; that he

gets a percentage of what he works on, and a percentage of work which he generates. "If it's a contingency case then it's a percentage. If it's an hourly case then it's an hourly fee." (Exam, p. 7, l. 3-4; p. 9, l. 22-23; p. 10, l. 1-10; p. 11, l. 9-12). He testified that he also has income from his own clients, separate and apart from fees earned from the Firm (Exam, p. 56, l. 6-8; p. 60, l. 15-18).

When questioned regarding an income entry in his <u>2007 tax return</u>, the following exchange occurred:

**Q.** Let me ask you to flip back to the last page of 2007 tax return. It says, "Partial payment in July 2007, $9,500." From whom did you receive this money?

**A.** A client.

**Q.** And how can you tell that it's from a client and not from the Zielke firm?

**A**. I know.

**Q**. How do you know?

**A.** I know.

**Q.** What do you base that on?

**A.** My knowledge.

**Q.** And who was the client?

**A**. That's privileged.

**Q.** Was the payment cash or check?.

**A.** It was a payment.

**Q.** You don't know if it was cash or check?...

**A**. I'm saying it's proprietary and privileged.
(Exam, p. 119, l. 14 - p. 120, l. 13).

When questioned regarding entries contained in his <u>2008 tax return</u>, the Debtor again was evasive:

**Q.** Let me ask you to flip back to the last page of your 2008 tax return. Schedule C, it says (Reading) "Other receipts, partial payment January of 2008, and partial payment/additional ticket $1,600". What are the additional tickets?

**A.** It's a transaction.

**Q.** Correct, and what are additional tickets?

A. Well, it speaks for itself. It's actually privileged related to a transaction with a client that I incurred that I received some additional compensation for.

**Q.** And from whom did you receive the additional tickets?

**A.** That's privileged.

**Q.** And you're refusing to answer?

**A.** It's privileged.

**Q.** Partial payment in January of 2008, from whom did you receive that?

**A.** That transaction is privileged too.

**Q.** And September 8th, the two payments?

**A.** All of them are.

**Q**. Okay. And Schedule C, you have listed additional tickets for clients. What are the tickets?

**A**. It's privileged. Privileged and proprietary.

**Q.** This is not receipts from a client... They're business expenses that you claimed on your tax return.

**A.** Okay. Related to client activities...

**Q.** So people made contributions to a nonprofit, and they got Superbowl tickets in exchange for that?

**A**. Yes (Exam, p. 124, l. 1 - p. 126, l. 22),

The Debtor may deny that he was aware that he was required to truthfully disclose all of his assets and liabilities under penalty of perjury, disclaiming any expertise in bankruptcy matters in an attempt to justify his actions (Exam, p. 17, l. 16-23; p. 18, l. 8-15). Such a disclaimer is totally inconsistent with the Debtor's previous representation of at least one debtor in bankruptcy proceedings filed with this Court (*In re Traci Lin Schumacher*, Case #01-31259).

Moreover, in accordance with the court's holding in <u>Cross v. General Motors Corporation</u>, 93 FRD 823, 825, 826 (D.C. E.D. Mo. 1982), an attorney litigant, as an officer of the court, may not freely claim ignorance of the law as an excuse. Instead, an attorney litigant is held to a higher standard of conduct and competence than a litigant who is not an attorney, because, to do otherwise, "could be regarded as precedent..."

Similarly, the Fifth Circuit Court of Appeals in <u>Coane v. Ferrara Pan Candy Company</u>, 898 F2d 1030, 1033 (1990), found "entirely appropriate the court's expectations of a heightened standard of conduct by a litigant who is an attorney". Consequently, the court held that an attorney litigant "was not entitled to use his special skills and knowledge as an attorney to maneuver this suit to his advantage, and to defy the orders of the court designed to advance its resolution". See, also, <u>Brewer v. Strillacci, et al</u>, 2003 U.S. Dist. LEXIS 25332 (D.C. D. Ct. 2003).

The Debtor's 2008 petition has been dismissed by this Court on <u>three</u> separate occasions, for various reasons, including (a) the Debtor's failure to file his Plan; (b) the Debtor's failure to file a motion to convert to Chapter 7, as ordered by this Court; and (c)the Debtor's failure to prosecute the case [Docket #7, 28 and 42, respectively]. The Debtor's actions, resulting in

repeated dismissals and reinstatements of his case, constitute legal maneuvering and dilatory tactics designed to avoid his obligations to his creditors.

## I. The Debtor's Petition Was Filed in Bad Faith.

The Sixth Circuit Court of Appeals in *Memphis Bank & Trust Company v. Whitman*, 692 F.2d 427, 432 (6th Cir. 1981) has enunciated the principle that a Debtor should not be permitted to obtain money, services or products by larceny, fraud or other forms of dishonesty, and then profit from his own wrongdoing by filing Chapter 13. The Court further held that the Debtor's good faith should be interpreted in light of the general purpose of Chapter 13:

> **The view that the Bankruptcy Court should not consider the debtor's preplan conduct in incurring the debt appears to give too narrow an interpretation to the good faith requirement**. *See, e.g., Matter of Kull*, 128 BR 654, 659 (S.D. Ga. 1982) (**among the facts a court should consider to determine whether a debtor has acted in good faith are "the circumstances under which the debtor contracted his debts and his demonstrated bona fides, or lack of same in dealing with his creditors**.") *(emphasis added)*

> One way to refuse to sanction the use of the bankruptcy court to carry out a basically dishonest scheme under Chapter 13 is to deny confirmation of the proposed plan. When the debtor's conduct is dishonest, the plan simply should not be confirmed. Unless courts enforce this requirement, the debtor will be able to thwart the statutory policy denying discharge in Chapter 7 cases for dishonesty.

In applying the later codification of the good faith requirement, in *In re Hall*, 346 BR 420 (Bankr. W.D. Ky. 2006), this Court stated as follows:

> Among the many changes made to the Bankruptcy Code by the BAPCPA was the addition of 11 U.S.C. §1325(a)(7). Under §1325(a)(7), a court may deny confirmation of a Chapter 11 plan if it finds that the petition was not filed in good faith...If this Court finds that a petition was not filed in good faith, it will then consider, based on the particular facts and circumstances presented, if the appropriate remedy is dismissal under §1307(c),or the less harsh remedy of denial of confirmation under §1325(a)(7). This Court additionally notes that the good faith standard for §1325(a)(3) and §1307(c)is identical, although the provisions address good faith in relation to the proposal of a Chapter 13 plan versus good faith filing of a Chapter 13 bankruptcy petition...

18

Although "good faith" is not defined in the Bankruptcy Code, the Sixth Circuit has developed a test that requires consideration of the "totality of the circumstances." *In re Alt*, 305 F.3d 413, 419 (6th Cir. 2002); *In re Barrett*, 964 F.2d 588, 591 (6th Cir. 1992). In reaching this determination, the Court should look at a list of non-exhaustive factors including: (1) the debtor's income; (2) the debtor's living expenses; (3) the debtor's attorney fees; (4) the expected duration of the Chapter 13 plan; (5) **the debtor's sincerity in seeking Chapter 13 relief**; (6) **the debtor's future earnings potential**; (7) any special circumstances, such as medical expenses; (8) **the frequency with which the debtor has sought bankruptcy relief;** (9) **the circumstances under which the debt was incurred**; (10) **the amount the debtor offered to pay as an indicator of sincerity to repay the debt**; (11) the trustee's burden in administering the plan; and (12) statutory policy that bankruptcy policy be construed liberally in favor of the debtor. *(Emphasis added)*

In analyzing the foregoing factors as a starting point, this Court in <u>*In re Hall*</u>, <u>supra</u>, determined that the Debtor had not acted in good faith in regards to either his petition or his plan. The Court considered such facts as (a) <u>the debtor's reduction in income;</u> (b) <u>contradictory statements made by the debtor;</u> (c)<u>the debtor's future earnings potential</u>; (d) <u>the fact that the debtor had filed a prior bankruptcy petition</u>; (e) <u>the debtor's reason for filing his instant proceeding, which was essentially to forestall one creditor's collection efforts</u>; and (e) <u>the debtor's lack of forthrightness with the Court</u>. After considering the foregoing factors the Court dismissed the debtor's petition with prejudice to refiling for one year.

The facts in the instant proceeding are much more egregious than those in <u>*In re Hall*</u>, <u>supra</u>. The Debtor's bad faith herein is evidenced by many factors, including the following:

(A) The Debtor's blatant misrepresentations in his bankruptcy petition and purposeful concealment of substantial assets, and undervaluation of other assets;

(B) The fact that the Debtor's creditors have not received payments since the filing of his Chapter 13 petition over one year ago, due to the Debtor's dilatory tactics;

(C)The Debtor's unauthorized sale of non-exempt estate property during the Chapter 13 proceeding;

(D) The Debtor's repeated failure to abide by Orders of this Court, the Local Rules and the Bankruptcy Code, resulting in numerous dismissals and delays in administration of his Chapter 13 proceeding, to the detriment of creditors;

(E) The timing of the Debtor's latest bankruptcy filing on the eve of foreclosure, coupled with his previous bankruptcy filing also on the eve of foreclosure;

(F) The Debtor's stated intent to utilize funds <u>not</u> to satisfy the claims of his creditors, but to repurchase real estate formerly owned by him, which is further evidence of his lack of any sincere effort to pay creditors;

(G) The Debtor's recently-filed tax returns, which could be described as "questionable", at best;

(H) The fact that the Debtor, as a licensed attorney with substantial legal experience and an officer of the court, should be held to a higher standard than lay persons who file bankruptcy, especially in terms of the need to comply with Court Orders, the requirement of honest disclosure of assets, and the ramifications of fraudulently procuring loans;

(I) The circumstances under which the Debtor incurred his obligations to creditors, including his numerous misrepresentations to CUB in obtaining credit, and his failure to file tax returns and pay his taxes for many years; and

(J) The Debtor's total lack of candor with this Court, including, by way of example, the following evasive and non-responsive answers to questions posed during the Court-ordered Exam:

**Q.** Let me hand you a document and ask you if you've ever seen it before.
(Handing the Debtor **Exhibit "H"**, the loan application supplied to CUB)

**A.** Probably.

**Q.** And why do you say probably? Is that your signature?

**A.** Could be. Looks like it.

**Q.** Did you give this financial statement to Citizens Union Bank when you sought the loan from them?

**A.** I have no idea.

**Q.** How many times have you sought loans from Citizens Union Bank?

**A.** Probably once.

**Q.** Do you have any reason to doubt that this loan application was given to Citizens Union Bank?

**A.** I just don't know. This is a copy. I don't see an original. It looks like my signature. This was a long time ago, if it was that application, so I don't know.

**Q.** Let me ask you to flip to the second page. You indicate on the bottom left-hand side that you had household items worth $500,000. What household items did you have that were worth $500,000?

**A.** I don't see where you're reading. I have no idea.

**Q.** Have you ever had $500,000 worth of household items?

**A.** I don't know. I mean, it depends on how you value things. I don't recall.

**Q.** Well, how did you value them—

**A.** I don't know.

**Q.** —when you put $500,000

**A.** You're asking me about something—

**Q.** That you signed?

**A.** –a long time ago, so I have no recollection.

**Q.** Did you have $500,000 worth of household items in 2003?

**A.** Don't know...

**Q**. If you did have $500,000 worth of household items in 2003, what happened to them?

**A.** You're asking a question about something I said that I don't recall, so I can't answer that question.

**Q**. You don't know what happened to them, or you don't know if you ever had them?

**A.** I'm saying I don't recall this.

**Q.** You don't recall giving a financial statement to get a loan?

**A.** Don't recall them. Looks like my signature, but this is not an original. You're asking me to talk about something that I obviously don't recall. There's not a date on here. I don't see anything on here.

**Q.** So you're saying that because it's not an original signature you don't know if you gave this or not?

**A**. I'm saying provide an original and let me look at it. But I don't recall. I don't recall where that came from.

**Q.** Ask you to flip to the third page of this under Declarations...

**A.** Where are you?

**Q**. ...had you ever been declared bankrupt within the last seven years? It doesn't ask if it was dismissed. "Have you ever been declared bankrupt," and you answered no.

**A.** What does that mean? "Have you been declared bankrupt within the past seven years." That is a very vague question.

**Q.** But somehow you answered no. You must have known what it meant.

**A.** Well, I had an interpretation at that time if, in fact, I signed this, and if, in fact—...

**Q.** Okay. Question number 3C says has— (Reading) Have you had property foreclosed upon or given title or deed in lieu of foreclosure in the last seven years? You answered no. Was that true? Had you had property foreclosed on?

**A.** Best of my knowledge, I don't know.

**Q.** You don't know why you answered no?

**A.** Because you're asking me questions–I'm repeating myself again. Give me an original. I still don't know if this is mine.

**Q.** Quit trying to avoid the question. You don't need an original to tell if this is your signature or not.

**A.** I said it looked like mine...Do you have an original?...

**Q.** Number E, "Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment?" And you answered no. Is that a true statement?

**A.** Show me a document that you can prove is mine.  I don't know.

**Q.** Well, I've got something to show you.  Why don't we do that? ...

**Q.** (Showing him judgments entered against Keith Hunter, which predate the Financial Statement.)   Is that the Kenneth – Keith Hunter that's got a judgment against him in 1999?  Is that you?

**A**.  Don't know.

**Q.** Keith B. Hunter, 1420 South Fourth Street?

**A.** That's what it says.  I'm reading it.

**Q.** Were you the only Keith Hunter that lived at that address?

**A.** To my knowledge, yes...

**Q.** Let me hand you another document, Commissioner's Deed dated September 2001. Are you the Keith Hunter that's mentioned in that deed?

**A.** What's your question?

**Q.** Are you the Keith Hunter that's mentioned in that commissioner's deed?

**A.** I don't know.  You'll have to ask the Commissioner.

**Q.** Are you telling me under penalty of perjury you don't know if you were involved in that transaction?

**A.** I didn't prepare this document.

**Q.** I didn't ask you if you prepared it.  I said, are you the Keith Hunter that's mentioned in that deed, yes or no?

**A**.  It's referred to—this is Keith Hunter here.  I see that.  I don't see the property.  This is probably the 1449 South Fourth Street property that I had referred to earlier.  To my knowledge, that's all I can discuss right now on this.

**Q.** That property was conveyed out of your name in 2001, wasn't it?

**A.** I don't know.  Is that what this says?

**Q.** You tell me.

**A.** I don't know.  I didn't read it.

**Q.** If you want to take a minute to read it.

**A.** Not really (Exam, p. 136, l. 17 - p. 143, l. 24).

The Debtor's testimony can hardly be characterized as "honest, forthcoming, truthful and frank", requirements stated by the Sixth Circuit Court of Appeals as necessary ingredients to a finding of good faith. *In re Alt*, 305 F.3d 413, 417, 421 (2002).   Instead, the Debtor's responses are more likened to those of the debtor in *Alt*, which the Court described as "laughable at best, fraudulent and criminal at worst", all of which the court found to be "shocking", and "not what bankruptcy is all about."

The Debtor's testimony is especially shocking, in light of the higher standard to which he is held, by virtue of his training and status as an officer of the court.   The Debtor has been playing fast and loose with this Court for the past fourteen months, and his incredible testimony is yet another indication of his bad faith, and his lack of a sincere desire and intent to pay his creditors.

Also lacking in credibility are the Debtor's bankruptcy schedules.  For example, the Debtor falsely swore in his bankruptcy petition that he had not previously filed bankruptcy.  The Debtor concealed the Pennsylvania Property, and did not disclose as assets outstanding fees and receivables which were owing to him.  The Debtor denied the existence of the Debtor Litigation claim, which is an asset of his estate.  Despite the Debtor's testimony that he pays $300.00 per month for rent to the Firm, the rent expense is not disclosed in Amended Schedule J (Exam, p. 14, l. 21-23).  The inclusion of this expense would result in even less "reported" net income to fund the Debtor's Plan, which would further reduce the likelihood of its confirmation.

Although the Debtor's bankruptcy filing, his behavior prior to and during this proceeding, and his proposed Plan have many alarming aspects to them, perhaps the most troubling of all is the Debtor's total disregard for the requirement of honestly and fully disclosing his assets. As observed by the Court in *In re Jongsma*, 402 BR 858, 875 (Bankr. N.D. Indiana 2009),

> While full and honest disclosure of property interests is only a factor to be considered in the analysis under 11 U.S.C. §1325(a)(7), the court deems that factor to be the most critical factor in determining whether or not a petition was filed in good faith. The unjustified failure to disclose interests in property which comprises property of the bankruptcy estate under 11 U.S.C. §541(a) taints a bankruptcy case from its beginning. Undetected, this failure results in a debtor's obtaining an unfair advantage over creditors, in violation of every standard for "good faith" enunciated by cases of the United States Court of Appeals for the Seventh Circuit. Detected, even if corrected, the court is confronted with determining whether or not the initial conduct by the debtor in tainting the case by non-disclosure constituted in essence an effort to "thwart" the debtor's creditors...

> The determination of whether or not a Chapter 13 plan complies with 11 U.S.C. §1325(a)(7) depends upon the application of a "totality of circumstances" test. The most critical component of whether or not a case has been filed in good faith is the disclosure of information required by Schedules and Statements of Financial Affairs at the inception of the case.

Under the widely-accepted "totality of circumstances" test, which test has been adopted by the Sixth Circuit, based upon the facts presented, the inescapable conclusion is that the Debtor's petition was filed in bad faith. It is rooted in dishonesty on every front, including nondisclosure of the prior bankruptcy filing, omitted and undervalued assets, and understated liabilities, all for the purpose of thwarting the Debtor's creditors.

## II.  The Debtor's Plan Was Also Proposed in Bad Faith.

 In addition to having filed his petition in bad faith, the Debtor's Plan was also proposed in bad faith. Holding  that the most important criteria under 11 U.S.C. §1325(a) is whether the Debtor has proposed his Plan in good faith, the Sixth Circuit Court of Appeals in *In re Caldwell*,

895 F.2d 1123, 1126, 1127 (1990), noted as follows:

> Discharge under Chapter 13, though a salvation for some debtors, is a loophole for others. The good faith, or lack of it, with which the plan is proposed, distinguishes a sincere effort at repayment from a false one...A Chapter 13 plan which proposes to repay only a small portion of a debt which could not be discharged under Chapter 7 deserves "particular scrutiny."...

> The party who seeks a discharge under Chapter 13 bears the burden of proving good faith...This court has suggested a twelve-part test to determine whether a debtor's Chapter 13 plan is proposed in good faith...Those criteria are:

> (1) the amount of the proposed payments and the amount of the debtor's surplus;

> (2) the debtor's employment history, ability to earn and likelihood of future increase in income;

> (3) the probable or expected duration of the plan;

> (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

> (5) the extent of preferential treatment between classes of creditors;

> (6) the extent to which secured claims are modified;

> (7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

> (8) the existence of special circumstances such as inordinate medical expenses;

> (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

> (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;

> (11) the burden which the plan's administration would place upon the trustee; and

> (12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code...

After applying these factors, the Court in _Caldwell_ found that:

**Rather than a good faith effort to repay this debt, we see an unbroken pattern**

**of deceit and delay**. Caldwell has evaded questions about federal tax refunds he received, and did not disclose a personal IRA containing $6,300 until the bankruptcy trustee discovered the account...**Caldwell also disclaimed any ownership in his mother's house, even though he is actually a one-quarter owner and has been since the house was bought almost a decade ago**...

**Caldwell has admitted many of his assets only when forced to by the creditors.... He contends that this is not bad faith. We believe it is...**

**As the district court observed, Caldwell is not the type of debtor whom the bankruptcy laws were meant to protect.... We agree that the bankruptcy court's decision that Caldwell had acted in good faith was clear error...**
(*Emphasis added*)

Similar to the facts in *Caldwell*, the Debtor herein has woven a tangled web of deceit and delay. As in *Caldwell*, the Debtor has falsely testified regarding his ownership of the Pennsylvania Property, which serves as his mother's home. The Debtor has concealed assets, which he reluctantly acknowledged only when left with no other alternative. Quite simply, the Debtor is not the type of debtor whom the bankruptcy laws were meant to protect.

After coming in and out of this Court like a swinging door for nearly one year, with creditors having received no payments on their claims, the Debtor has finally filed his Plan [Docket #65], which he now seeks to have this Court approve. The Debtor's Plan, which is nothing more than a continuation of his questionable pre-filing and post-filing activities, reeks of bad faith.

By way of illustration, the Debtor filed a motion in litigation styled *Auto Owners Insurance Company v. Cherish Brown*, in which he represented to the Jefferson Circuit Court that "It is anticipated that Mr. Hunter will resume a moderate work schedule in early April 2010." (**Exhibit "W"**). However, no provision whatsoever is made the Debtor's Plan for payment of any of the funds to be realized from the resumption or expansion of his private practice activities,

scheduled to occur in approximately sixty days.

Similarly, the Debtor has made no provision whatsoever to pay to creditors any of the proceeds of his outstanding accounts receivable, fees accrued to date on his contingent-fee cases, or the $100,000.00 - $150,000.00 fee which was scheduled in his petition. In fact, none of this income was even mentioned in Amended Schedule I, which only listed the Debtor's income from the Office, in the gross amount of $4,020.28. The Debtor's current listed income is in sharp contrast to the $8,100.00 per month which was originally reported on the Petition Date.

From this new, reduced amount, the Debtor has now deducted approximately fourteen (14%) percent to be set aside in his retirement account, to be protected from his creditors' claims. **In essence, the Debtor is proposing to pay himself nearly fourteen (14%) percent of his gross salary, in addition to paying his living expenses, while paying his unsecured creditors, who have been held at bay during this protracted proceeding, only six (6%) percent of their claims.** Based upon this fact alone, it is quite apparent that the Debtor is unwilling to sincerely devote his resources to payment of his creditors.

Moreover, ignoring the proofs of claim filed by the IRS and the Revenue Cabinet, the Plan lists the claims of the taxing authorities as follows:

| | |
|---|---|
| Revenue Cabinet | $ 18,167.00 |
| IRS | $137,156.76. |

These amounts differ significantly from the amounts reflected in the proofs of claim filed in this case:

| | |
|---|---|
| Revenue Cabinet | $28,380.70 |
| (Secured Priority Claim, plus undetermined taxes owing for tax years 2004, 2005, 2006 and 2007) | |
| IRS | $210,884.24 |

28

(Unsecured Priority Claim for $23,167.54; Unsecured General
Claim for $187,716.70.)

The Plan, which proposes to make total plan payments in the amount of **$166,805.04**, falls

woefully short of even satisfying the outstanding tax claims totaling **$239,264.95,** <u>plus</u> state taxes

owing for 2004, 2005, 2006 and 2007. This shortfall does not even factor in Debtor's counsel's

fees, or any payments to unsecured creditors.

In summary, the Plan inaccurately reports no secured creditors; grossly understates the

amounts owing to the taxing authorities, and does not provide for the dedication of all of the

Debtor's income to funding of the Plan. Moreover, under the Plan, <u>assuming the Debtor makes</u>

<u>all payments as required</u>, including payments to the taxing authorities in amounts less than what is

actually owing to them, the unsecured creditors will receive only **<u>six (6%) percent</u>** of their

claims. Based upon these facts alone, the Plan is not confirmable.

Further, Schedule J does not include the $300.00 per month rent expense which the Debtor

testified he is paying to the Firm, which would further reduce the funds available for creditors.

Based upon the figures contained in Amended Schedules I and J, after payment of $300.00 rent to

the Firm, only $600.42 per month will remain for payment to creditors.

As further evidence of his bad faith, the Debtor has admitted under oath that he disposed

of assets of the estate during the pendency of the Chapter 13 proceeding. Not only did the Debtor

lack authority to sell the property without prior Court approval, the Debtor totally ignored this

Court's Order restraining and enjoining him "from selling, transferring, abandoning, releasing to

creditors, or in any way disposing of property until further order of the court." While this would

constitute a serious violation by <u>any</u> debtor, the fact that an attorney Debtor would choose to

ignore this Court's Orders is even more disturbing, and is a further indication of the total

disregard this Debtor has for the Court's authority. Such actions cause the Debtor to be in contempt of this Court's Order and the Bankruptcy Code, both of which require the Debtor to preserve and protect estate property. *In re Fatsis,* 396 BR 579, 582 (Bankr. D. Mass. 2008).

Clearly, under no stretch of the imagination could the proposed Plan ever satisfy the best interest of creditors test, in that every aspect of the Plan is fraught with bad faith. This bad faith, when combined with the bad faith filing and the Debtor's improper activities, precludes confirmation of the Debtor's Plan.

### III. The Debtor's Plan is Non-Confirmable.

In order for a Chapter 13 Plan to be confirmable, the following conditions, *inter alia,* must be met:

(A) The Plan must comply with the provisions of Chapter 13 and with other applicable provisions of Title 11;

(B) **The Plan must be proposed in good faith and not by any means forbidden by law;**

(C) The value of property to be distributed under the Plan on account of each allowed unsecured claim must not be less than the amount that would be paid if the Debtor's estate were liquidated under Chapter 7; and

(D) **The action of the Debtor in filing the petition must be in good faith**.

As set out in detail hereinabove, not only was the petition filed in bad faith, the Debtor's Plan was filed in bad faith. The finding of bad faith on either count precludes the confirmation of the Debtor's Plan under 11 U.S.C. §1325.

Moreover, 11 U.S.C. §1325(a)(1) provides that a bankruptcy court shall confirm a Chapter 13 Plan only if "the plan complies with the provisions of this chapter and all other provisions of this title." The Debtor's Plan is not confirmable, due to unreasonable delay by the Debtor which

has been prejudicial to creditors; the Plan's failure to satisfy the best interest of creditors' test; and the Debtor's failure to timely file a plan and to commence making timely payments to creditors. Finally, the Debtor has not demonstrated that all of his disposable income is being applied to make payments under the Amended Plan, as required by 11 U.S.C. §1325.

The law is clear that the Debtor bears the burden of demonstrating that his Plan satisfies the requirements of 11 U.S.C. §1325(a). *Hardin v. Caldwell*, 895 F.2d 1123, 1126 (6th Cir. 1990). See also *In re Ross,* 231 BR 635, 638 (Bankr. S.D. Ohio 1999); *In re Erbaugh*, 199 BR 367, 369 (S.D. Ohio 1996); *In re Nosker*, 267 BR 555, (Bankr. S.D. Ohio 2001). Under the facts before the Court, it is impossible for the Debtor to meet this burden.

## CONCLUSION

Based on the foregoing facts, authorities and arguments, this Court should deny confirmation of the Debtor's Plan.


_____/s/ Cathy S. Pike_____
Cathy S. Pike
Michael R. Gosnell
WEBER & ROSE, P.S.C.
471 W. Main Street, Suite 400
Louisville, Kentucky 40202
(502) 589-2200
Counsel for Citizens Union Bank


## Certificate

_____It is hereby certified that a copy of the foregoing was served on the electronic service list, this __8th__ day of February 2010.

_____/s/   Cathy S. Pike_____
Cathy S. Pike